**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RONALD CAMBREL,** | : | |
| | : | |
| **Petitioner** | : | |
| | : | **CIVIL NO. 3:CV-08-1684** |
| **v.** | : | |
| | : | **(Judge Caputo)** |
| **WARDEN BRYAN BLEDSOE, *et al.*,** | : | |
| | : | |
| **Respondents** | : | |

**M E M O R A N D U M**

## I.    Introduction

The Petitioner, Ronald Cambrel, proceeding *pro se*, brings this action pursuant to 28 U.S.C. § 2241 for habeas relief.  Petitioner is an inmate at the United States Penitentiary in Lewisburg, Pennsylvania, a facility of the Federal Bureau of Prisons (BOP).  Petitioner was sentenced to a term of twenty (20) years to life in the District of Columbia Superior Court after pleading guilty to first degree murder.  The Petition challenges the repeated refusals of the District of Columbia Board of Parole (DC Board) and the United States Parole Commission (Parole Commission) to grant him parole even though recommended by the DC parole guidelines.  He argues that the Parole Commission continues to consider impermissible factors for the purpose of manufacturing a finding of "unusual circumstances" to deny him parole.

Respondents filed a Response to the Petition (doc. 7), and Petitioner has filed a Traverse (doc. 10).  Also pending before the Court are two motions to

supplement the petition (docs. 7 and 14).  According to the Petitioner, neither submission changes "the substance of [his] initial arguments; instead the supplement[s] merely suppl[y] additional evidence to support [his] claims that the Commission violated Federal law by failing to apply the District of Columbia Parole Statues, Regulations, Guidelines, Rules, Policies, Practices and Customs."  (*See* Docs. 12 and 14.)   For the reasons set forth below, the Petition will be denied as will the motions to supplement.


**II.      Standard of Review**

Challenges by a petitioner in federal custody concerning parole decisions go to the execution of a sentence and are properly brought against petitioner's custodian under 28 U.S.C. § 2241.  *See Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 241-42 (3d Cir. 2005)(§ 2241 allows federal prisoner to challenge the execution of sentence, such as the denial of parole).

It is well-settled that "there is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence."  *Greenholtz v. Inmate of Nebraska Penal & Correctional Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *see also Ellis v. District of Columbia*, 84 F.3d 1413 (D.C. Cir. 1996)(DC parole statute and regulations do not create any liberty interest in parole).  Even though a convict has no liberty interest in parole release protected by the Due Process Clause, a fundamental due process right to be free from "capricious decision making" protects parole applicants from being denied

parole for "arbitrary or constitutionally impermissible reasons."  *Block v. Potter*, 631 F.2d 233, 236 (3d Cir. 1980).

Pursuant to the National Capital Revitalization and Self-Government Improvement Act of 1997 (Revitalization Act), Pub.L. No. 105-33, § 11231(a)(1), 111 Stat. 712, 745, D.C. Code § 24-131(a), the DC Board was abolished, and the Parole Commission assumed jurisdiction over parole decisions for District of Columbia offenders.  The Parole Commission is vested with discretion to determine a District of Columbia prisoner's eligibility for parole.  *See United States v. Addonizio*, 422 U.S. 178, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979); *Muhammad v. Mendez*, 200 F. Supp.2d 466 (M.D. Pa. 2002); *McRae v. Hyman*, 667 A.3d 1356 (D.C. 1995)(holding that the District of Columbia's parole scheme confers discretion to grant or deny parole, and the scoring system creates no liberty interest overriding the exercise of that discretion).  The district court's review of such a decision is "not whether the [decision of the] Board is supported by the preponderance of the evidence, or even by substantial evidence; the inquiry is only whether there is a rational basis in the record for the Board's conclusions embodied in its statement of reasons."  *Zannino*, 531 F.2d 687, 691(3d Cir. 1976); *see also Furnari v. Warden, Allenwood Fed. Correctional Inst.*, 218 F.3d 250, 254 (3d Cir. 2000).  "To this end, 'the Commission may not base its judgment as to parole on an inaccurate factual predicate.'" *Id*. (citing *Campell v. United States Parole Comm'n.*, 704 F.2d 106, 109 (3d Cir. 1983)). However, in making its decision, the Parole Commission may consider hearsay, counts of an indictment that has been dismissed, and information in a separate dismissed indictment.  *See Campbell*, 704 F.2d 109-110 (collecting cases).

-3-

The appropriate remedy when the Parole Commission exceeds its discretion is to remand the matter to the agency for further proceedings consistent with the court's opinion.  *See Mickens-Thomas v. Vaughn*, 355 F.3d 294, 309-10 (3d Cir. 2004)(citing *Bridge v. United States Parole Commission,* 981 F.2d 97, 105 (3d Cir. 1992)).

### III.    Relevant Statutory Background

In 1985, the DC Board promulgated a set of parole regulations.  Those regulations were not formally published in the District of Columbia Municipal Register until 1987 (the 1987 guidelines).  *See* D.C. Mun. Regs, tit. 28 (28 DCMR), §§ 100 et seq. (1987)(repealed 2000).  Under the 1987 guidelines, after a DC Code offender served his minimum sentence, he was eligible for parole consideration.  28 DCMR § 200.1 (1987).  Once eligible for parole, the DC Board was authorized to consider the offender's suitability for release on parole:

> [w]henever it shall appear to the [DC Board] that there is a reasonable probability that a prisoner will live and remain at liberty without violating the law, that his release is not incompatible with the welfare of society, and that he has served the minimum sentence imposed or the prescribed portion of his sentence, as the case may be, ... upon such terms and conditions as the Board shall from time to time prescribe.

D.C. Code § 24-404(a).

The 1987 guidelines of the DC Board set forth a scoring system for use in deciding whether to grant or deny parole.  *See* 28 D.C.M.R. § 204.1 (1987); *Sellmon v. Reilly*, 551 F.Supp.2d 66, 69-73 (D.D.C. 2008); *Ellis v. District of Columbia*, 84

F.3d 1413, 1415-17 (D.C. Cir. 1996). Under these guidelines, "even if the prisoner established everything the statute required, the Board of Parole still had discretion to deny parole." *Ellis*, 84 F.3d 1415.

> In sum, the District's parole system is grounded in the exercise of discretion by the Board, with a numerical system to aid in the exercise of that discretion. The numerical system is not a rigid formula, however, because the Board is not required to either grant or deny parole based upon the score attained ... [T]he Board [has] authority, in unusual cases, to ignore the results of the scoring system and either grant or deny parole in the individual case, conditioned upon the Board's setting forth in writing those factors it relied on in departing from the result indicated by the scoring system. Therefore, because the statute and regulations vest in the Board substantial discretion in granting or denying parole ... they lack the mandatory character which the Supreme Court has found essential to claim that a regime of parole gives rise to a liberty interest.

*McRae v. Hyman*, 667 A.2d 1356, 1360-61 (D.C. 1995)(internal quotations and citations omitted).

Initially, each parole applicant is assigned a salient factor score (SFS) which serves as "one factor" in determining parole eligibility by assisting in determining the risk of releasing the prisoner. *Ellis*, 84 F.3d 1415-16; 28 DCMR § 204.2 (1987). Six categories are then evaluated, and given a numerical value which when combined range from 0 - 10. *Id.* at p. 1416.[1] The DC Board then "modifies a prisoner's risk category by adding or subtracting points for pre and post-incarcerations factors."

---

[1] The six categories considered are: (1) "Prior convictions and adjudications (ranging from 0 - 3)," (2) "Prior commitments of more than thirty days (0 - 2)," (3) "Age at the time of the commission of the current offense (0-2)," (4) "Recent commitment-free period (0-1)," (5) "Status of the prisoner at the time of commission of the current offense (0-1)," and (6) "History of heroin or opiate dependence (0-1)." *Ellis*, 84 F.3d at 1416; 28 DCMR § 204.4.

*Ellis*, 84 F.3d at 1416.  Points are added if: (1) "[t]he prisoner's current conviction involved violence against a person, the use of a dangerous weapon, or drug distribution; or if the prisoner has two or more previous convictions for these types of crimes;" or (2) "the prisoner has committed serious disciplinary infractions."  *Id*.; 28 DCMR § 204.18(a)-(h).   A point is subtracted if the prisoner "has demonstrated sustained achievement in prison programs, industries or work assignments."  *Id*.; 28 DCMR § 204.18(i).  The application of these factors yields the offender's total point score (TPS) which can range from 0 - 5.  *Id*. at 1416; 28 DCMR §§ 204.19.

In the case of an adult offender, a TPS of 0, 1, or 2 indicates that parole may be granted after the initial hearing, and a score of 3 or more indicates that parole should be denied and a rehearing scheduled.  *See*  28 DCMR §§ 204.19.  In subsequent hearings, the DC Board begins with the total point score from the previous hearing.  *See* 28 D.C.M. R. § 204.21 (1987).  This score is either increased or decreased in one point increments depending on the prisoner's program achievement and institutional adjustment.  *See Ellis*, 84 F.3d at 1416.  At rehearings, adult offenders with a point score between 0 and 3 "shall be granted parole" while those with TPS of 4 or 5 "shall be denied" parole.  *Id*.; 28 DCMR § 204.21 (1987)  Regardless of the convict's point score, "the regulations permit the Board to deviate from the parole determination suggested by the guidelines 'in unusual circumstances'".  *Ellis*, 84 F.3d at 1416.

> The Board may, in unusual circumstances, waive the SFS and the pre and post incarceration factors set forth in this chapter to grant or deny parole to a parole candidate.  In that case, the Board shall specify in writing those factors which it used to depart from the strict application of the provisions of this chapter.

28 DCMR § 204.22 (1987).  The DC Board identified a non-exhaustive list of

"factors countervailing a recommendation to grant parole" to be considered at an

offender's initial and reconsideration hearings:

> • the offender has had repeated failures under parole supervision;
> • the instant offense(s) involve(s) on-going criminal behavior;
> • the offender has a lengthy history of criminally-related alcohol abuse;
> • the offender has a history of repetitive, sophisticated criminal behavior;
> • the offender has an unusually extensive or serious prior record, including at least five felony convictions;
> • the instant offense(s) involve(s) unusual cruelty to victim(s);
> • the offender has engaged in repeated or extremely serious negative institutional behavior;
> • the offender has a lengthy history of criminally-related substance abuse;
> • the offender had the opportunity, but made little or no effort toward rehabilitation or preparation for remaining crime-free if released to the community; and
> • the offender needs programs and/or rehabilitation services to minimize risk to the community when actually released to parole.

Ellis, 84 F.3d at 1416; see also Sellmon, 551 F.Supp.2d at 69-71; 28 DCMR § 204

and Appendices 2-1 and 2-2 (1987).[2]

---

[2]  The DC Board's 1991 Policy Guidelines give greater definition of each of these terms and the criteria and parameters for their usage in parole matters.  (See Doc. 2-1 at CM/ECF pp. 4-12.)  Further, in some situations there are limits placed on the duration of the Board's consideration of a countervailing factor that may be considered at an offender's initial hearing, but not again at his rehearing.  For instance, the DC Board may only consider certain classes of disciplinary infractions at an inmate's initial parole consideration that have occurred within specified times of the convict's minimum sentence, see Doc. 2-1 at CM/ECF p. 10-11, at his parole reconsideration, the Board may only consider certain offenses which "occurr[ed] since the preceding release consideration on the sentence ...".  Id. at CM/ECF at p. 11.  This distinction as to the consideration of disciplinary infractions varies significantly
(continued...)

As reflected above, the DC Board retained discretion to grant or deny parole notwithstanding the result recommended by the TPS.  *Ellis*, 84 F.3d at 1419 (explaining that "under the regulations, a prisoner with a low total point score shall be granted parole unless the Board, in the exercise of its discretion, believes there is some other reason for not granting him parole."); *see also*  28 DCMR § 204.22 (1987).  If parole is denied at the initial hearing or a subsequent rehearing, a "set off," or period of time an offender may remain incarcerated before being considered for parole, is established by the DC Board.  While the guidelines set forth a schedule to be utilized when determining the offender's set off is based on the imposed term of imprisonment, "[t]he Board, *in its discretion,* may schedule a reconsideration date later than the prescribed set-off if one or more aggravating factors are present...." *Hall v. Henderson,* 672 A.2d 1047, 1052 (D.C. 1996)(emphasis added); *See* 28 DCMR § 104.11 (1987).[3]

On August 5, 1998, pursuant to the National Capital Revitalization and Self-Government Improvement Act of 1997 (Revitalization Act), Pub.L. No. 105-33, § 11231(a)(1), 111 Stat. 712, 745, D.C. Code § 24-131(a), the DC Board was abolished, and the Parole Commission assumed jurisdiction over parole decisions

--------

[2](...continued)
from other situations where the same countervailing offense, such as the Board's consideration of the unusual cruelty to victims of the instant offense, which may be considered at the offender's initial parole consideration and/or his parole rehearings without restriction.  *Id.* at CM/ECF p. 10.  *See also Sellmon,* 551 F.Supp.2d at 71.

[3]  When a person is serving a maximum sentence of less than five (5) years, reconsideration shall ordinarily occur within six (6) months.  28 DCMR § 104.1 (1987). Offenders serving a maximum sentence of more than five (5) years shall ordinarily receive rehearings within twelve (12) months.  28 DCMR § 104.2 (1987).

for District of Columbia offenders.  The Revitalization Act requires the Parole

Commission to apply the DC Board's parole criteria, rather than its own guidelines,

in deciding a DC offender's parole eligibility.  *See* D.C. Code § 24-131.  Likewise,

the regulations specify that for those District of Columbia prisoners who had their

initial parole hearing before August 5, 1998, "the Commission shall render its

decision by reference to the guidelines of the former DC Board of Parole in effect on

August 4, 1998."  *See* 20 C.F.R. § 2.80(a)(4); *see also Sellmon, supra*.

Nonetheless, the Parole Commission, like the DC Board, has the authority to depart

from those guidelines.  *See  Ellis,* 84 F.3d at 1419-20 (holding that the DC Board

has discretion to depart from guidelines); *McRae*, 667 A.2d at 1357 (same).


**IV.    Cambrel's Criminal History and Parole Proceedings.**

**A.    Mr. Cambrel's Criminal History.**

On April 9, 1973, Preston Spears was at home while his
family was out; that when his two daughters (ages 16
and 22) and his son (age 21) returned, they found their
father with his hands tied behind his back, being watched
over by Cambrel, who was armed with a gun; and that
Cambrel ordered all four persons up the stairs, where he
bound and gagged them, and placed them in separate
rooms.

. . .

Cambrel ransacked the home and asked the son several
times to tell him where money and valuables were located;
that Cambrel stabbed the son repeatedly in the neck; that
while the son pretended to be dead, Cambrel raped the
younger daughter, stabbed her several times in the neck,
and ransacked her room; that Cambrel then beat the older
daughter, stabbed her, kicked her down the stairs and
threw a lamp in her face; and that he left about three hours
after arriving.

. . .

> when the Spears children were able to untie themselves,
> they found their father in his room, dead, with his hands
> tied, neckties pulled around his throat so as to cause
> strangulation, and his throat slashed; that after leaving the
> Spears' residence, Cambrel went to the home of friends,
> where he appeared calm and asked if he could stay there
> at night; that he was arrested the next day; that all three
> Spears children positively identified Cambrel; and that
> Cambrel's palm print was found on the toilet seat in the
> Spears' home.

*Cambrel v. United States*, 330 A.2d 746, 747 fn. 1 (D.C.C. 1975); (*see also* Doc. 7-2, Respts' Exs. at CM/ECF pp. 7-17).[4]  On January 10, 1974, Ronald Cambrel was sentenced in the Superior Court of the District of Columbia to 20 years to life in prison after pleading guilty to first degree murder.  (Doc. 1, Pet. at p. 11.)

**B.    Mr. Cambrel's Initial and Rehearing Parole Proceedings.**

On May 5, 1993, the DC Board conducted Mr. Cambrel's initial parole hearing.  (Doc. 7-2 at  p. 18.)  He was assigned a SFS of 7.  (Doc. 2-1 at  p. 61.) After considering his pre and post incarceration factors, he received a point for the violent nature of his offense in which a weapon was used; a point for serious negative institutional adjustment, and had one point subtracted for positive program achievement.  (*Id*. at p. 63.)  His TPS was found to be a "2" which under the 1987 guidelines suggested "parole shall be granted at the initial hearing with the highest level of supervision required."  (*Id*.)  Although the parole guidelines recommended

---

[4]  Unless otherwise noted, all citations to the record reflect the docket number and page number assigned by the electronic case filing system (CM/ECF) rather than the page numbers of the original documents.

the grant of parole, the DC Board found the following countervailing factors against his release:  (1) the instant offense involved unusual cruelty to the victims; (2) the offender has engaged in repeated or extremely serious negative institutional behavior; (3) the offender has a lengthy history of criminally-related substance abuse; and (4) his need for programs and/or rehabilitation services to minimize risk to the community when actually released on parole.  (Doc 7-2 at p. 19.)  Specifically, it was noted that Petitioner had accrued "49 major [disciplinary reports]" prior to his initial hearing as well as a new conviction in 1989 for Possession of a Weapon by a Prisoner some of which have been for assault against other inmates and the use of drugs while incarcerated.  (Doc. 2-1 at pp. 21-25, p. 65, and pp. 69-74.)  The DC Board denied parole and ordered a rehearing in 1995.  (Doc. 7-2 at  p. 19.)  He was given the following special instructions for reconsideration: "drug abstinence; intensive drug program; no new discp. reports."  (*Id*. at p. 18.)

     In 1995, the DC Board again reconsidered him for parole.  (*Id*. at p. 20.)  Although the Hearing Examiner recommended paroling Mr. Cambrel to his 18 month detainer, not all Board members concurred in this decision.  (Doc. 2 at p. 88-95.)  A special parole rehearing was scheduled before the full board.  (*Id*. at pp. 97-100; Doc. 2-2 at pp. 1 - 4.)  Board members considered that while petitioner acquired 50 disciplinary reports while incarcerated, he had not received any new incident reports since 1992.  (Doc. 2-2 at p. 3.)  One of the non-concurring Board members erroneously noted that Mr. Cambrel had "killed three people in a single family."  (*Id*. at p. 4.)  The outcome of the special hearing was that, even though the parole guidelines recommended the grant of parole, the DC Board denied parole for the

-11-

following reasons:  the offender has engaged in repeated or extremely serious

negative institutional behavior; and the offender needs program and rehabilitative

services to minimize risk when released on parole.  (Doc. 7-2 at pp. 20-21.)s  He

was given a 2000 reconsideration date with the following special instructions for

reconsideration: "psychological evaluation; psychological counseling; sex offender

therapy; narcotics anonymous; maintain drug abstinence; no new disciplinary

infractions; work detail; [and] program participation."  (*Id*. at p. 20.)

By June 2000, Petitioner's next reconsideration date, the United States

Parole Commission (Parole Commission) had assumed responsibility of making

parole determinations for all eligible DC Code offenders.  A Hearing Examiner

prepared a rehearing summary.  (*Id*. at pp. 22-24.)  The "Evaluation" portion of the

Hearing Examiner's summary reflects the following:

> The subject has been incarcerated since 1/10/74, and has
> served 318 months at the time of this hearing. *The subject,
> in order to be held accountable for his instant current
> offense has not been held accountable with the amount of
> time he has used for the murder, assault and rapes.*  This
> examiner believes that the subject needs to continue
> programming and receive psychological treatment for his
> sex offenses.

(*Id*. at p. 23)(emphasis added).[5]  On August 9, 2000, the Parole Commission issued

---

[5]  Under the 1987 Regulations offense accountability was not a legitimate rationale
for departing from the action indicated by the TPS.  *See Sellmon*, 551 F.Supp.2d at 97
(Concern for offense accountability "is the one applied to determine federal prisoners'
suitability for parole under the *federal parole guidelines.  See* 28 C.F.R. § 2.18.")

In part, 28 C.F.R. § 2.73(b) states:

> It is the policy of the Commission with respect to District of
> Columbia Code offenders that the minimum term imposed by the

(continued...)

its decision to deny Petitioner parole and give him a rehearing in June 2003.  (Doc.

2-2 at p. 16.)  The Board went outside the guideline recommendations that indicated

parole should have been granted because:

> You are a more serious risk than indicated by your point
> score in that your instant offense involved unusual cruelty
> to the victims in that you fatally stabbed one man inside his
> own residence and stabbed three others in the throat
> creating a substantial risk for serious injury or death.  In
> addition, you raped one of the victims.  *You continued to
> demonstrate assaultive tendencies while incarcerated as
> evidenced 1968, 1987, incident reports prior to 1988.  You
> then received a conviction for an incident in which you
> stabbed another inmate at the Lorton facility.*  Your pattern
> of aggressive and deadly violence makes you a serious risk
> to the community and continued programming in anger
> management is need prior to any further Parole
> consideration.

(Doc. 2-2 at p. 16) (emphasis added).  On March 31, 2001, an amended Notice of

Action (NOA) relative to the August 9, 2000, rehearing was issued.  (Doc. 7-2 at pp.

24 - 25.)  The NOA was modified "because of an error in the dates that appeared on

the NOA."  (*Id*. at p. 24.)  Except as noted below, the language of the August 2000

and the March 2001 NOA is similar:

> You continue to demonstrate assaultive tendencies while
> incarcerated as evidenced by your receiving several
> incident reports for assaultive behaviors prior to 1988.  In
> January 1989, you received a conviction for Possession of
> Contraband Weapon (shank) which you used to assault
> another inmate.

---

[5](...continued)
> sentencing court presumptively satisfies the need for punishment
> for the crime of which the prisoner has been convicted, and that
> the responsibility if the Commission is to account for the degree
> and the seriousness of the risk that the release of the prisoner
> would entail.

(Doc. 7-2 at p. 25.)

On August 9, 2003, a Parole Commission Hearing Examiner conducted Mr. Cambrel's rehearing.  (*Id.* at p. 26.)  On his own behalf, Mr. Cambrel raised several objections related to prior rehearing reviews.  He said when the DC Board first heard his case, one of the members erroneously made a note that he had killed four people and believed that he was denied parole in 1995 based on this erroneous information.[6]   (*Id.*)  The Hearing Examiner advised that the "Commission considered the offense behavior at the hearing and the Commission correctly noted that subject although he stabbed four individuals, only one of those individuals died."  (*Id.*) Petitioner also voiced concern that the Parole Commission exaggerated his pre-1988 institutional disciplinary history when it held that he has "several instances of assaultive behavior prior to 1988 ... and ... the Commission erroneously used that information to go outside his parole Grid Score of 1."  (*Id.* at p. 27.)  The examiner recounted past references in Mr. Cambrel's file, those which have appeared since his initial hearing in 1993, which indicate he incurred 49 incident reports while in DC custody, his new conviction for the assault of another inmate, and a listing of disciplinary infractions outlined in his presentence report for his 1989 assault

_____

[6]  As previously noted, while one board member (Quick) noted that Petitioner had killed three people, there is no evidence in the record to support a finding that any other Board member relied upon this misinformation in casting their vote to either grant or deny him parole.  In fact, the documents submitted by Petitioner contradict any such finding as each Board member wrote out the basis of his or her vote which did not include a finding that he had committed more than one murder.  (*See* Doc 2-2 at pp. 1 - 4.)

conviction.[7]  (*Id.*)  Specifically, the

> examiner reviewed with subject each of the incident reports outlined in that Presentence Report.   The examiner believes there are enough incident reports outlined in that summary to include Possession of Major Contraband on 06/21/88 (which led to the new sentence), Threatening Conduct on 6/5/87, Creating a Disturbance on 07/3/81, Threatening Conduct to Correctional Officer on 8/21/81, Assault on 12/16/81 in which he allegedly struck another inmate with a Shank, Fighting incidents on 8/3/75 and 8/12/75.  The subject argued that these reports were not sufficient to go outside the guidelines.

(*Id.*)  In the "Evaluation" section of the Hearing Examiner's report, she noted that:

> Subject has completed an Anger Management Program which the Commission requested by the examiner notes that the brutality of the instant offense coupled with subject's serious institutional record up through 1988 do not allow this examiner at this time to recommend a parole date.   Notwithstanding the fact that the subject has adjusted in a fairly positive manner for the past 15 years, that length of time does erase the original offense which involved the brutal stabbing of four individuals resulting in the death of one and the rape of a 16 year old girl. Coupled with the subject's involvement with weapons in the institution up to and including some 15 years after he began service of this sentence, the examiner recommends parole be denied and that subject once again be continued for a Rehearing in 3 years in July 2006 after service of 36 months from the rehearing date of 6/20/00.

(*Id.* at p. 28.)  The September 24, 2003, NOA reflects that the 1987 guidelines were employed when deciding to deny him parole even though the guidelines suggested parole should have been granted.  The Parole Commission based its decision on

---

[7] Upon later inquiry into this issue, the Hearing Examiner received copies of two incident reports from Mr. Cambrel's case manager and a copy of the 1988 PSI, which outlined the 49 incident reports described.  Search for copies of the other incident reports was futile.  (Doc. 7-2 at p. 29.)

the following:

> After consideration of all factors and information presented, a departure from the guidelines at this consideration is warranted because you are a more serious risk than indicated by your grid score in that your offense involved unusual cruelty to the victims in that you fatally stabbed one man inside his own residence and stabbed three others in the throat creating a substantial risk of serious injury or death.  In addition you raped one of the victims. You continue to demonstrate assaultive tendencies while incarcerated are evidenced by you receiving several incident reports for assaultive behavior prior to 1988.  In January of 1988, you received a conviction for Possession of Contraband Weapon (shank), which you used to assault other inmates.  Your pattern of aggressive and deadly violence extended from your instant offense up to including 15 years after incarceration (your new conviction in 1989) makes you a serious risk to the community and continued programming in Anger Management and all similar programs available at your institution of confinement is needed prior to any further parole consideration.

(*Id*. at p. 30.)

On October 25, 2007, a rehearing was held and a summary report was formulated.  (*Id*. at pp. 32-34.)  At the rehearing Mr. Cambrel argued that a previous hearing examiner had "misus[ed] the guidelines and that the guidelines imposed are inaccurate and the reasons on the Notice of Action that were identified in the Notice of Action dated 9/24/2003 and the prior Notice of Action was using the same behavior to hold [him] in prison."  (*Id*. at p. 32.)  It was noted that since his last rehearing, he had received an incident report for the possession of a sharpened instrument.  Thus, his previous Grid Score of 0 was increased by 1 due to the incident report and decreased by 1 for program achievements, yielding a Grid Score of 0.  (*Id*. at p. 33.)  On November 9, 2007, the Parole Commission issued a NOA

denying Mr. Cambrel parole and continuing him for rehearing in 12 months.  (*Id.* at

p. 35.)  Invoking the 1987 DC guidelines as the standard used to evaluate Mr.

Cambrel's suitability for parole, the Parole Commission found that while the

guidelines indicated release on parole, they were departing from them:

> because you are a more serious risk than indicated by your Grid Score in that your offense involved unusual cruelty to the victim in that you fatally stabbed a man inside his own home and stabbed three others creating a substantial risk for serious injury or death.  In addition, you raped one of the victims, you continued to demonstrate assaultive tendencies while incarcerated as evident by you receiving several incident reports for assaultive behavior prior to 1988.  In January of 1988 your received a conviction for Possession of Contraband Weapon (shank) which you used to assault other inmates.  Your pattern of aggressive and deadly violence extends from your instant offense up to and including your 30+ years of incarceration (your new conviction in 1989) makes you a more serious risk to the community.  Your new incident report dated 10/20/2004 for Possession of a Sharpened Instrument demonstrates that your need for weapons indicates that you still possess a threat to others.  Additional programming is needed in order for you to lessen the likelihood that you would commit a criminal act in the community.

(*Id.*)

## V.  Discussion

### I.  The Commission Applied the Appropriate Guidelines to the Petitioner's Parole Determinations.

Ronald Cambrel was sentenced in the Superior Court of the District of

Columbia on January 10, 1974.  (Doc. 1, Pet. at p. 11.)  As the DC Board conducted

his initial parole hearing on May 5, 1993, the Parole Commission's decisions

regarding his parole must be made in reference to the DC Parole Guidelines in

-17-

effect on August 4, 1998.  *See* 28 C.F.R. § 2.80(a)(5).  Accordingly, the 1987
Guidelines were to be applied to all Parole Commission rehearing considerations.
Neither the Constitution nor these guidelines create a liberty interest in parole.  *Ellis,*
*84 F.3d at 1420*; *Muhammad v. Mendez*, 200 F.Supp.2d 466 (M.D. Pa. 2002).
Further, the 1987 guidelines permit the Parole Commission to depart from the
parole determination suggested by the guidelines to the same degree as originally
granted to the DC Board.  *See* 28 DCMR § 104.11.

## II.    Application of the 1987 Guidelines at Petitioner's Rehearings.[8]

Mr. Cambrel suggests that the 1987 Regulations and 1991 Guidelines were
applied to his parole reconsideration hearings in name only.  Thus, the Court will
undertake a review of his 1995, 2000, 2003 and 2007 rehearings to determine
whether the appropriate guidelines not only identified but employed by the authority
vested with the discretion to grant or deny parole at each hearing.

### A.    Mr. Cambrel's 1995 Rehearing.

As noted earlier, in 1995, although the DC Board determined that the 1987
regulations recommended to grant him parole,[9] in an exercise of their discretion they
did not grant him parole because of the following countervailing factors: (1)

---

[8]  In his Traverse, Petitioner states that "at his 1993 initial hearing [he] was properly
denied parole, placed in 'unusual circumstances' (when the point score indicated 'parole
shall be granted'), and properly given a set-off, 'when particular procedures are followed ....'"
28 DCMR§ 204.1.  (Doc. 10, Traverse at p. 3.)  As it does not appear that Petitioner is
challenging the appropriateness of the application of the 1987 guidelines at his initial parole
hearing, the Court will not review that finding to determine whether the DC Board complied
with all applicable regulations and established law in departing from the guidelines in that
instance.

[9]  His TPS was 2 which suggested the granting of parole absent "unusual
circumstances."  28 DCMR § 204.22.

-18-

participation in repeated or extremely serious negative institutional behavior; and (2) his additional need for program and rehabilitative services to minimize risk when released on parole.  (Doc. 7-2 at pp. 20-21.)  In reaching its decision Board members noted that although Mr. Cambrel had acquired almost 50 disciplinary reports and acquired a new conviction during his incarceration, he remained misconduct free since 1992.  (Doc. 2-2 at p. 3.)

Under the 1987 Guidelines and the 1991 Definitions, only specifically defined serious disciplinary infractions, or in the case of multiple disciplinary infractions, which occurred "since the preceding release consideration on the sentence shall ordinarily be considered as repeated or extremely serious negative behavior".  (*See* Doc. 2-1 at p. 11.)  While Mr. Cambrel does not dispute that his institutional adjustment during the first 15 years of incarceration was fraught with disciplinary reports, these pre-1992 reports were already taken into consideration by the DC Board at his initial hearing in 1993 and he was given a two year set off based, in part, on his poor institutional adjustment.  (Doc. 7-2 at  at pp. 18 - 19.)  To utilize these misconducts again as a reason for departing upward from the resulting guideline range, where he had not received an disciplinary reports in the interim, exceeded the authorization of the applicable 1987 guidelines.  However, this finding does not demand the granting of his habeas petition as the DC Board cited other permissible discretion-based reasons for departing from the guidelines recommending the grant of parole, specifically their belief that Mr. Cambrel would benefit from psychological and sex offender counseling and other specific programming needs that would minimize his risk to the community when actually

released on parole.  Such a finding is rationally related to the DC Board's discretion to determine his suitability for parole.  *See* 28 DCMR § 24-404(a).  Given the nature of Mr. Cambrel's offense and difficult, but recently improved, ability to abstain from drugs and disciplinary infractions and violent altercations, the DC Board articulated a rational basis for departing from the parole guidelines.  Furthermore, as the only relief the Court could provide him would be a new hearing, and he has already received a subsequent hearing, his challenge to the 1995 DC parole determination is denied.

### B.    Mr. Cambrel's 2000 Rehearing Conducted by the Parole Commission.

At Mr. Cambrel's 2000 rehearing, purportedly conducted under the 1987 DC Parole Guidelines, the Parole Commission determined his TPS to be 1.  (Doc. 7-2 at p. 23.)  He did not receive any disciplinary reports since his 1995 rehearing, yet the Hearing Examiner noted that "[t]he subject, in order to be held accountable for his instant current offense has not been held accountable with the amount of time he has used for the murder, assault and rapes." (*Id.*)  On March 30, 2001, the Parole Commission denied him parole, even though indicated by the 1987 Guidelines, after finding he was a more serious risk than indicated by his point score.  (*Id.* at p. 25.)  They cite the following countervailing factors: (1) unusual cruelty to the victims; (2) continued assaultive tendencies while incarcerated as evidenced by his incident reports issued prior to 1988; (3) his post-incarceration 1989 conviction for Possession of Contraband Weapon (shank) used to assault other inmates; and (4) his pattern of aggressive and deadly violence makes him a risk to the community

and continued programming and anger management is needed prior to any further parole consideration.  (*Id.*)

For the reasons previously cited, the reconsideration of Mr. Cambrel's pre-1995 disciplinary conduct as a countervailing factor to deny a recommendation of parole at rehearing was improper under the 1987 guidelines as he did not incur any misconducts between 1995 and 2000.

Likewise, the hearing examiner's consideration that Mr. Cambrel, after serving 318 months of confinement, had not been held accountable for his current offense exceeded was an impermissible factor for exceeding the recommendations of the 1987 Guidelines.  (Doc. 7-2 at p. 23.)  "The 1987 Regulations presume that the minimum sentence imposed by the sentencing court appropriately accounts for a parole candidate's offense severity and accountability and that the parole decision should be limited to consideration of the offender's risk of recidivism and institutional conduct."  *See Sellmon*, 551 F.Supp.2d at 88; 28 DCMR § 200.1.  Having met his minimum sentence date established by the sentencing court, Mr. Cambrel, per definition of the 1987 Regulations, was "eligible" for parole.  Thus, to the extent the Parole Commission was influenced by the "evaluation" of the hearing examiner consideration as to whether the length of his incarceration did not hold him accountable for his crimes, such consideration exceeded the scope of the 1987 Regulations.  (*Id*. at 69-70.)  However, it is noted that the 2001 NOA issued by the Parole Commission does not mention "accountability" as a reason for denying parole.  (Doc. 7-2 at p. 25.)

Notwithstanding the incorrect application of this post-incarceration criteria for facilitating parole decisions as well as the accountability factor, the Parole Commission cites other allowable and legitimate reasons for finding Mr. Cambrel is a more serious risk than his total point score would indicate.  The overwhelming cruelty of the instant offense to his victims is undisputable and shocking.  Petitioner, during a home invasion, killed the father of the three sibling victims who were all stabbed in the throat and the minor daughter was raped.  Consideration of the cruelty to Mr. Cambrel's victims, unlike the consideration of how and when negative institutional behavior is regarded, is unrestricted as a countervailing factor for going outside the 1987 Regulations and 1991 guidelines to deny parole.  *See Sellmon*, 551 F.Supp.2d at 69-71; 28 DCMR § 204 and Appendices 2-1 and 2-2  of 28 DCMR § 204.1 (1987); *see also* 1991 Policy Guidelines.  Thus, the Parole Commission's findings that Mr. Cambrel is a more serious risk to the community than his TPS score indicates, is solidly based on their consideration of the unusual cruelty of the instant offense to his victims.  This finding negates any implication he was harmed as a result of the Parole Commission's improper consideration of stale disciplinary findings or consideration of his offense accountability in its 2000 parole determination.

**C.    Mr. Cambrel's 2003 Rehearing Conducted by the Parole Commission.**

At the time of Mr. Cambrel's 2003 rehearing, he had served 363 months in custody.  (Doc. 7-2 at  p. 26.)  He had not incurred any disciplinary reports since his 2000 rehearing.  (*Id*. at p. 27.)  He had a TPS score of "0".  *Id*.  On September 24,

2003, the Parole Commission's NOA (*id.* at p. 30) invoked the 1987 DC Board of Parole Guidelines as a basis for the rehearing review.  Although technically suitable for parole based on his TPS, the Parole Commission cited the unusual cruelty Mr. Cambrel displayed towards his victims, and his continued assaultive behavior based on his pre-1988 disciplinary reports and his new 1989 conviction for a basis of departing from the guideline recommendation for parole.  (*Id.*)

For reasons already discussed in this Memorandum, consideration of stale disciplinary reports which were not accrued in the interim between his 2000 and 2003 reconsideration hearing was improper under the 1987 Regulations.  However, as the Commission cites to at least one valid countervailing reason for its parole decision which falls outside of the numerically determined guideline, the Parole Commission's denial of parole has a rational basis for departing from the parole guidelines.  *See* 28 DCMR § 204.22.  Clearly, the Parole Commission's finding of "unusual cruelty to the victims" is a valid and reasonable finding, enumerated in writing, for departing from the results of the scoring system.

### D.     Mr. Cambrel's 2007 Rehearing Conducted by the Parole Commission.

As of his 2007 reconsideration hearing, Ronald Cambrel had served 415 months in custody.  His previous 2003 TPS score was "0".  While he consistently lost a point for his program achievements as he had done in all of his previous rehearings, he unfortunately gained one point for his receipt of a 2004 disciplinary

-23-

report for the possession of a sharpened instrument.[10]   At his rehearing his TPS or grid score was "0".  (*See* Doc. 7-3 at pp. 32 - 33.)

On November 9, 2007, the Parole Commission issued a NOA indicating that it had used the 1987 DC Board of Parole's guidelines in reaching its decision to depart from the recommended score and deny Mr. Cambrel parole.  *(Id*. at p. 35.) Again, the unusual cruelty of the instant offense to the victims was cited.  His historical violent and serious negative institutional conduct, in addition to the disciplinary report of 10/20/2004 for the possession of a sharpened object, were also noted as reason for deviating from the application of the 1987 guideline results which suggested the grant of parole.  While the use of the state disciplinary reports, those issued prior to 2003 in this instance, was improper under the 1987 guidelines as a basis for a finding of an "unusual circumstance" warranting departure from the guideline recommendations, *see* 28 DCMR § 204.22; *see also* DC Board of Parole Policy Guidelines (Dec. 16, 1991), this error is negated by the Parole Commission's proper use of its discretion to deviate from the 1987 guidelines based on the unusual cruelty to the victims of Mr. Cambrel's instant offense, and the Parole Commission's belief that Petitioner's recent misconduct charge demonstrates his recurrent reliance on weapons as a good  indicator of the probability that Mr. Cambrel's release was not compatible with the welfare of society at that time.  By specifying these multiple reasons for the exercise of their discretion to deviate from the guidelines, the Parole Commission cites at least one valid reason for the finding

---

[10]  Pursuant to 28 DC ADC § 502.11, the possession of a knife or other weapon constitutes a Class I offense.

of "unusual circumstances" to deviate from the results of the 1987 Regulations scoring system, there exists, upon the record, a finding of a rational and reasonable basis for denying Ronald Cambrel parole in 2007.


**VI.    Conclusion.**

For the foregoing reasons, the Petition for Writ of Habeas Corpus (Doc. 1) will be denied.  An appropriate order follows.




                                        **/s/ A. Richard Caputo**
                                        **A. RICHARD CAPUTO**
                                        **United States District Judge**
**Date:  August 5, 2011**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

**RONALD CAMBREL,**                      :
                                          :
    **Petitioner**                   :
                                          :      **CIVIL NO. 3:CV-08-1684**
  **v.**                              :
                                          :      **(Judge Caputo)**
**WARDEN BRYAN BLEDSOE,** *et al.,*       :
                                          :
    **Respondent**                   :


**O R D E R**


    **AND NOW**, this  **5th**  day of **AUGUST, 2011,** for the reasons discussed in the

accompanying memorandum, it is hereby ordered that:

       1.  Mr. Cambrel's 28 U.S.C. § 2241 habeas petition (doc.
1) is denied.

       2.  Mr. Cambrel's Motion to Supplement (doc. 12) is
denied as moot.

       3.  Mr. Cambrel's Motion to Amend (doc. 14) is denied as
moot.

       4.  There is no basis for the issuance of a certificate of
appealability.

       5.  The Clerk of Court is directed to close this case.


             **/s/ A. Richard Caputo**
             **A. RICHARD CAPUTO**
             **United States District Judge**